IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
October 15, 2019 Session

## STATE OF TENNESSEE v. DONALD LEE SHIELDS, JR.

**Appeal from the Circuit Court for Warren County**
**No. 17-CR-1576     Larry B. Stanley, Jr., Judge**

_____

### No. M2019-00344-CCA-R3-CD
_____

After a trial, a Warren County jury found Defendant, Donald Lee Shields, Jr., guilty of three counts of especially aggravated kidnapping, one count of false imprisonment, and one count of attempted aggravated assault. The trial court sentenced Defendant as a Range I standard offender to an effective sentence of eighteen years. On appeal, Defendant argues that the evidence is insufficient to support his convictions for especially aggravated kidnapping. After a thorough review of the record and applicable case law, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

ROBERT L. HOLLOWAY, JR., J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS, P.J., and ROBERT H. MONTGOMERY, JR., J., joined.

Robert S. Peters, Winchester, Tennessee, for the appellant, Donald Lee Shields, Jr.

Herbert H. Slatery III, Attorney General and Reporter; Clark B. Thornton, Senior Assistant Attorney General; Lisa S. Zavogiannis, District Attorney General; and Matthew Colvard, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION

### Factual and Procedural History

In addition to Defendant, the grand jury indicted Co-Defendants Zachary Dale Turner, Jeffrey Scott Pegg, and Ashley Dawn Golden.[1] A summary of the counts charged against Defendant is as follows:

_____

[1] Only Co-Defendant Turner was indicted in Counts Five through Nine.

| Count | Offense | Result | Victim |
|---|---|---|---|
| One | Especially aggravated kidnapping | Guilty | Mr. Dye |
| Two | Especially aggravated kidnapping | Guilty | Mr. Beaver |
| Three | Especially aggravated kidnapping | Guilty | Ms. Denson |
| Four | Especially aggravated kidnapping | Guilty of false imprisonment | Ms. Vanatta |
| Ten | Aggravated rape | Dismissed/*nolle prossed* | Ms. Christenson |
| Eleven | Aggravated assault | Dismissed | Mr. Dye |
| Twelve | Aggravated assault | Guilty of attempted aggravated assault | Ms. Denson |

Co-Defendant Turner submitted guilty pleas, and the trial court severed the trials of the two remaining co-defendants.

At Defendant's trial, Lisa Denson testified that in August 2017 she went to McMinnville with her boyfriend, James Beaver, and her friends Stephanie Vanatta and Rahsaan Dye ("the victims") because Ms. Vanatta wanted "to pick up something." Ms. Denson said that she had never been to McMinnville prior to this trip and that she was "completely lost on where [she was]." The victims arrived at Co-Defendant Turner's house, which was "out in the middle of nowhere[.]" Ms. Vanatta went inside the house, while Ms. Denson, Mr. Beaver, and Mr. Dye remained in the car. Approximately thirty minutes later, Ms. Vanatta exited the house, and Defendant and Co-Defendants Pegg and Turner followed, telling the victims that they "had to come in." Ms. Denson heard the co-defendants refer to Defendant as "D.J." The victims followed the co-defendants back into the house, and "they" said that twenty-six grams of methamphetamine were missing, worth approximately $2,000. The co-defendants told the victims that they could not leave until the methamphetamine was found. Ms. Denson stated that the co-defendants suspected that Ms. Vanatta or another of Co-Defendant Turner's customers, Jamie Christenson, had taken the drugs.

Ms. Denson testified that, at some point after the victims went into Co-Defendant Turner's house, Defendant left. The victims sat together on a couch and were held at gunpoint by Co-Defendants Turner and Pegg. Ms. Denson stated that the co-defendants collected the victims' cell phones so that no one could contact police. The co-defendants required the four victims to write out their names, addresses, families' names, and social security numbers.

After several hours, the victims and Ms. Christenson "all got taken outside" and were made to fight one another in an effort to produce the drugs. Ms. Denson stated that Defendant returned during this fight. Defendant told the victims to tie themselves with ropes so that he and Co-Defendant Turner "wouldn't be charged with it." Ms. Denson said that "[t]here was a big metal chain attached to the back of [Defendant's] truck to [latch them]selves onto the back[.]" Defendant told the victims that he would "take [them] for a trip around the yard." Ms. Denson testified that, once the victims were latched to the back of the truck, Defendant "jerked it in drive," and the truck pulled the rope tighter around Ms. Denson's ankles. Ms. Denson screamed, and after about ten seconds, Defendant stopped the truck, releasing Ms. Denson's rope. Ms. Denson stated that this resulted in bruising to her thigh, back, and right ankle. Ms. Vanatta then asked Co-Defendant Turner if the victims could "try to find a way to come up with $2,000[.]" The victims each tried calling friends or family to procure the funds, and the victims were required to make calls using speakerphone so that Co-Defendant Golden could monitor the conversations. Ms. Denson stated that, when Mr. Beaver tried to tell his mother on the phone about his situation, Defendant came in and said, "I should gut you. Hang up that phone right now."

Ms. Denson testified that, while the other victims were making phone calls, Co-Defendant Turner took her to the bathroom and raped her. Additionally, each victim underwent a "cavity search" by undressing and bending over a kitchen counter while the co-defendants checked for the drugs. During these cavity searches, Defendant was in the kitchen holding a gun. Defendant warned the victims that, if they moved, he would "shoot [their] kneecaps out." Defendant and Co-Defendant Turner took Mr. Beaver and Mr. Dye outside and forced them to do yardwork to "work off the money that was gone."

Ms. Denson testified that, the second morning of the ordeal, police knocked on Co-Defendant Turner's front door, and the co-defendants forbade the victims to move, speak, or make any noise. Eventually, the police left. Later, Ms. Denson heard a car horn honking. The co-defendants told the victims that "the car was reported stolen" and "to run because the police were coming." Ms. Denson, Mr. Beaver, and Mr. Dye "[took] off running" to the nearest neighbor, approximately one mile away. The neighbor called the police and then told Ms. Denson that, two weeks prior, "a man was shot dead in [Co-Defendant Turner's] driveway." Ms. Denson testified that, in total, the victims were confined to Co-Defendant Turner's house for three days.

On cross-examination, Ms. Denson admitted that Ms. Vanatta asked for a ride to McMinnville to buy methamphetamine. Ms. Denson agreed that she also used methamphetamine at that time. Ms. Denson testified that she spoke with Investigator Jody Cavanaugh on the night of August 12, 2017, and provided complete information about what had occurred, including giving him the name "D.J." Ms. Denson stated that,

initially, Co-Defendant Turner carried a shotgun, but when the victims were outside latching themselves to the truck, she did not see anyone with a shotgun. Ms. Denson stated that Defendant carried a "silver, pearl-handled pistol." Ms. Denson testified that, when they were latched to the truck and Defendant "jerked it in drive," it did not go further than about "a foot and a half" because there was too much weight attached to the back of the truck. She stated that the victims were not treated "as bad[ly] until [Defendant] showed up. It got worse."

On redirect examination, Ms. Denson testified that the victims believed that, if they tried to escape, they "would have been shot and killed" because Co-Defendant Turner said, "[I]f you try to leave[,] it's not going to be pretty." Ms. Denson stated that, while she was held captive at the house, she observed a surveillance system with "six to eight different camera slots [with] cameras pointed everywhere outside and inside the house." She testified that, just before the victims latched themselves to the back of the truck, Defendant and Co-Defendants Pegg and Turner were "stomping" Mr. Dye "with their boots[,]" and Defendant cut Mr. Dye with a knife on the back and side of his neck. Ms. Denson stated that, when Investigator Cavanaugh later showed her a picture of Defendant for identification, she "shook" and "cringed" because "the stuff [Defendant] put [the victims] through was really, really scary."

Stephanie Vanatta testified that she was currently in custody in a different jurisdiction on a probation violation and drug charges. She stated that, in August of 2017, she knew that Co-Defendant Turner's house on Cherry Springs Road in Warren County was a place where she could buy drugs. Ms. Vanatta testified that, after she left Co-Defendant Turner's house, she heard someone whistle and say "come back in." Co-Defendant Turner informed her that "he had dope missing and that everybody had to come in" because Ms. Vanatta could have stolen it and then handed it to one of the car's occupants when she returned to the car. Ms. Vanatta stated that Co-Defendant Turner carried a shotgun and said, "[N]obody is f'ing leaving." Co-Defendant Turner suspected that Ms. Vanatta, Co-Defendant Pegg, or Ms. Christenson had taken the drugs because they were the only ones who had been in his bedroom. When Ms. Christenson returned to the house, Defendant was with her. Co-Defendant Turner forced Ms. Vanatta, Co-Defendant Pegg, and Ms. Christenson to fight each other to "prove that [they] didn't take it." Ms. Vanatta testified that Defendant carried a pistol and told the victims he would "shoot [their] kneecaps out" if they did not cooperate.

Ms. Vanatta stated that Ms. Denson, Co-Defendant Pegg, and Ms. Christenson were required to tie themselves to the back of Defendant's truck. After these three were released, Ms. Vanatta was "chained up" to the truck. Defendant got into the truck and "put it in drive[.]" Ms. Vanatta testified that the ropes tightened and that she started screaming. She asked Co-Defendant Turner if the victims could "please try to call and

get some money." Defendant responded by saying, "Let me take them just one time around the yard."

Ms. Vanatta testified that the victims called friends and family asking for money. She said that, when Mr. Beaver called for help, he said "something about 'they got me' or 'they won't let me go' or something because they took the phone away from him[.]" Ms. Vanatta stated that Defendant and Ms. Christenson decided to do cavity searches on the victims and that Defendant was "[s]tanding there with a pistol" during the searches. She said, "We were forced to get naked in front of everybody that was standing there and this girl [Ms. Christenson,] she stuck her fingers inside of me and I was on my period." Ms. Vanatta said that the co-defendants were "acting crazy, hostile" and that, every time Co-Defendant Turner would calm down, Defendant "would get him amped up again talking about . . . taking [the victims] around the yard one time."

On cross-examination, Ms. Vanatta testified that she had no recollection of meeting Defendant or Ms. Christenson prior to the August 2017 incident.

James Beaver testified that he was currently in custody for a probation violation. He said that, in August 2017, Ms. Vanatta asked him to drive her to McMinnville in exchange for some gas money. Mr. Beaver stated that Ms. Vanatta went into Co-Defendant Turner's house, and after she returned to the car, Defendant and Co-Defendant Turner came outside and told them to go into the house. Mr. Beaver said that he heard the other co-defendants refer to Defendant as "D.J." Co-Defendant Turner told the victims that "there was dope that came up missing" and that he would not release the victims until they gave him the money for the missing drugs.

Mr. Beaver stated, "Couple of times I got hit. I don't know by who [sic]. People had guns. He just told us not to leave the house, not to leave the residence. And when we tr[ied] to make phone calls, they [took] the phones from us. They took everything from us." Mr. Beaver believed that, if any of the victims tried to leave, they would "get beat up" and possibly "shot." He said that the victims were forced to go outside and that Defendant and Co-Defendant Turner told the victims to tie their ankles to the back of a truck. Mr. Beaver said the truck "tugged" and "got tight." The victims were "all screaming." Mr. Beaver stated that Mr. Dye "[got] a little extra because of the fact he's black" and that Defendant and Co-Defendant Turner assaulted Mr. Dye, hitting him and cutting his neck. He said that he and Mr. Dye were forced to do chores and yardwork.

Mr. Beaver testified that, when he tried to call someone to obtain money, he "started crying," so "they told [him] to get off the phone." He said that the victims were strip-searched and that Co-Defendant Turner took Ms. Denson into a bedroom for "a good ten minutes." Mr. Beaver said that he was unable to help Ms. Denson because the

co-defendants had guns from "the first day [the victims] stepped in the house." Mr. Beaver testified that he saw a surveillance system in the house with "a big screen TV with several different cameras on it[,]" some of which were "looking outside the house."

On cross-examination, Mr. Beaver stated that Defendant was at Co-Defendant Turner's house during the day but that he did not remember seeing Defendant there at night. On redirect examination, Mr. Beaver said that Defendant cut Mr. Dye on the neck and that Defendant had a pistol. Mr. Beaver stated that he felt like "whoever had the gun would shoot [him] or the three people that were with [him]." On recross-examination, Mr. Beaver agreed that, because he was not facing Defendant and Co-Defendant Turner at the time Mr. Dye was cut, he could not see which one of them held the knife. On further redirect examination, Mr. Beaver confirmed that, at the time Mr. Dye was cut, Co-Defendant Turner had both of his hands on a pole, so he inferred that Defendant was the one with the knife.

Rahsaan Dye testified that, prior to August 2017, he had never been to McMinnville and that the victims "took a lot of back roads to get there." Mr. Dye stated that Ms. Vanatta went into Co-Defendant Turner's house for several minutes and then returned to the car. Then "a couple of people" came out and motioned for them to come into the house because some drugs were missing. Mr. Dye explained that the co-defendants initially waited for "a blonde girl" named "Jamie" to return because they believed she might have the drugs. When Defendant arrived at Co-Defendant Turner's house, "they" took Mr. Dye's phone and told him to write down his name and personal information. Mr. Dye testified that the victims were told to call family and friends to try to get money for the drugs that were missing. Then, three of the victims were told to tie themselves "to the bumper of a truck and they was [sic] threatening on dragging them around if they didn't come up with the dope or the money." Later, Ms. Vanatta was told to fight with Co-Defendant Pegg and Ms. Christenson, and Ms. Vanatta "got, pretty much, her a** beat by a couple of people." Mr. Dye testified that he was upset that his "friends were getting hurt," so he "must have said something because they did turn their intentions onto [him]." He was "kick-stomped," and he saw "a rifle and a little pistol." Mr. Dye testified that he was "cut from behind" on his neck. Mr. Dye testified that the co-defendants crafted several theories regarding the missing drugs. He said:

> They thought [the drugs were] in the car and then I guess they ripped the car apart and they didn't find it there. Then they did think that somebody might have keisted [sic] it and they gave us -- they pretty much stripped us all down and had somebody stick their finger up our a** to make sure that it wasn't in our a**.

Mr. Dye stated that he did not consent to the cavity search. He said that he remembered Defendant "going in and out of the house shooting a rifle." Mr. Dye believed that, if he tried to leave, the co-defendants would shoot him. Because Mr. Dye and Mr. Beaver were forced to move a deep freezer from the house to the barn, Mr. Dye began to consider "a number of possibilities . . . especially after being told that [they could not] leave." After the victims were released, Mr. Dye was treated at the hospital for an infection that developed in the cuts on his neck.

On cross-examination, Mr. Dye stated that he believed Co-Defendant Turner was the person who cut him. He also said that he did not recall who was driving the truck when the victims were tied to it.

Ashley Golden testified that she was in custody for a probation violation from Cannon County and for four counts of especially aggravated kidnapping in the present case and was awaiting trial. Co-Defendant Golden stated that she was present at Co-Defendant Turner's house on August 9, 2017, because her sister lived there and she was spending the night with her. She did not have a vehicle, so when her sister left, she was "kind of stuck there[.]" She stated that she was not present in the room when Ms. Vanatta bought drugs. She heard people talking in the kitchen and went out of her sister's room to see what was happening. Co-Defendant Turner told her that methamphetamine was missing and asked her to look for it.

Later, Co-Defendant Golden heard Ms. Vanatta tell Mr. Dye that Co-Defendant Turner's drugs were missing and that "nobody [could] leave until it's found." She stated that, at different times during the ordeal, Defendant had a shotgun, a black handgun, and a silver revolver. When Ms. Christenson arrived, she told Co-Defendant Golden to collect the victims' cell phones.

Co-Defendant Golden testified that, on the second morning, Co-Defendant Turner took the four women into the bathroom and stated that Ms. Christenson and Ms. Vanatta were the "only ones in there to have been able to take it. So they needed to beat it out of one another." Everyone went outside, and Ms. Christenson and Ms. Vanatta began to fight while Co-Defendant Turner and Defendant held firearms. After the fight, Co-Defendant Turner and Defendant forced everybody to tie themselves up so they could drag them behind the pickup truck. Co-Defendant Golden testified that Ms. Vanatta asked Co-Defendant Turner if the victims could call friends and family to ask for money. Shortly thereafter, "a fight broke out between [Co-Defendant Pegg] and Mr. Dye and then [Co-Defendant Turner] got involved and Mr. Dye ended up cut on the neck." Co-Defendant Turner and Defendant stated that, if anyone ran, "they would blow [their] kneecaps out."

Co-Defendant Golden stated that the next morning, the victims were "strip-searched" while Defendant and Co-Defendant Turner held guns on them. She said that Ms. Denson was taken back to the bedroom while everyone else was searched in the living room. When Ms. Denson emerged from the bedroom, she was upset and became very ill, vomiting profusely.

Co-Defendant Golden testified that, when the victims were released, she and Ms. Vanatta "ran towards the woods" and remained there for several hours. Eventually, Co-Defendant Golden and Ms. Vanatta returned to Co-Defendant Turner's house to retrieve Ms. Vanatta's cell phone. Ms. Vanatta wanted to return because she was concerned for her daughter and grandchild because Co-Defendant Turner had her address. Co-Defendant Golden said that she went back to the house with Ms. Vanatta because she did not want her to go there alone. After they returned to the house, the police arrived, and Co-Defendant Golden was arrested.

On cross-examination, Co-Defendant Golden testified that she did not know why she was indicted in Counts One through Four. She stated that she saw Co-Defendant Turner cut Mr. Dye.

Jeffrey Scott Pegg testified that he had been indicted in the present case. He said that he worked with Co-Defendant Turner at Morrison Industries and would stay at Co-Defendant Turner's house for extended periods. Co-Defendant Pegg stated that, when the victims arrived on August 9, 2017, Defendant and Co-Defendant Turner had been using methamphetamine for "a few days" and had not been sleeping well. He said that, after Ms. Vanatta bought some drugs and returned to her car, Co-Defendant Turner realized that he "was missing his meth. [Co-Defendant Turner] instructed [the victims] to come back into the house and said nobody was leaving until he got his meth back or the money." Co-Defendant Pegg stated that Defendant had a gun and threatened the victims, saying that "it would probably be a good idea to give him his meth back before something bad would happen." Co-Defendant Pegg said that he, Co-Defendant Golden, and Ms. Vanatta were made to fight each other. He stated that everyone was handed rope and told to tie themselves up but that he refused to do so. Co-Defendant Pegg said that Defendant was driving a truck and that some people were tied to the back. Shortly thereafter, Co-Defendant Pegg kicked Mr. Dye and began hitting him, and Co-Defendant Turner attacked Mr. Dye with a knife. Co-Defendant Pegg stated that Defendant was "amping [Co-Defendant Turner] up and keeping him fired up and going." Co-Defendant Pegg stated that, at the direction of Co-Defendant Turner, Ms. Christenson strip-searched the victims. Defendant stood nearby with a gun. Co-Defendant Pegg noted that Co-Defendant Turner took Ms. Denson into a bedroom and kept her there for twenty or thirty minutes.

Co-Defendant Pegg stated that, after Defendant arrived at Co-Defendant Turner's house, he remained there "basically the whole time" and had a pistol most of that time. Co-Defendant Pegg said that he, Mr. Beaver, and Mr. Dye were forced to do yardwork. Later, Co-Defendant Pegg heard Co-Defendant Turner blowing a car horn, and he went to the back door to investigate. Co-Defendant Turner told Co-Defendant Pegg, "Get everybody out of my house. The police are coming in. Which one of y'all called the police?" At that point, Co-Defendant Pegg told everyone to leave, and he went to the house of a friend who lived nearby.

On cross-examination, Co-Defendant Pegg stated that he had been using methamphetamine with Co-Defendant Turner for approximately one year prior to the events of August 2017. He said that, when Co-Defendant Turner used methamphetamine, he would "go crazy sometimes[.]" Co-Defendant Pegg confirmed that, in an affidavit, he stated that Defendant was not "all that bad" and that Defendant "was doing basically what he was told[.]" Moreover, in the affidavit, Co-Defendant Pegg stated that Defendant "was afraid of [Co-Defendant] Turner himself." Co-Defendant Pegg said that, when the victims were tied to the truck, he did not recall the truck ever being started and that it did not move.

On redirect examination, Co-Defendant Pegg read a portion of his affidavit into the record:

> While we were outside, [Mr.] Dye and [Co-Defendant] Turner were arguing. He said something. I don't remember much about what he said. [Co-Defendant] Turner looked at me and said, "Pegg, you . . . better get him. There's already been one murder here; don't make it another one." So I kicked him a couple of times. That's when [Co-Defendant] Turner cut [Mr.] Dye on the back of the neck with a knife. The cut didn't need medical attention. [Co-Defendant] Turner and [Defendant] were present when I kicked [Mr.] Dye. I don't know why [Co-Defendant] Turner cut [Mr.] Dye. Maybe he may have thought he had something to do with [Co-Defendant] Turner's dope which Turner said was missing. When all of that was over, [Co-Defendant] Turner told us all to go back in the house. He told everybody to get back in the house and sit. [Co-Defendant] Turner was walking around the yard all mad. I don't know what he was doing or saying. He was cussing, it sounded like, and yelling and we were told to sit in the living room with [Defendant].
>
> . . . .

[Defendant] was basically [Co-Defendant] Turner's right-hand man. [Co-Defendant] Turner would tell [Defendant] to have us sit and watch us, me myself and the four others.

Evan Cooper testified that he was a deputy with the Warren County Sheriff's Department. On August 11, 2017, he was dispatched to Cherry Springs Road to investigate a call regarding three persons who had been held captive for two days. When he arrived, Deputy Cooper met Ms. Denson, Mr. Dye, and Mr. Beaver, who "were very skittish" and whose "hands would shake[.]" As they talked, "cars would drive by, [and] they would run and duck and hide and get behind trees or behind my car . . . trying to hide[.]" Deputy Cooper took the victims' statements. He observed two cuts on the back of Mr. Dye's neck, as well as bruising on the other victims' ankles.

Jody Cavanaugh testified that he was an investigator with the Warren County Sheriff's Department. On August 11, 2017, Investigator Cavanaugh was assigned to the present case. He and another investigator interviewed Mr. Dye, Mr. Beaver, and Ms. Denson and concluded that their stories were consistent. Investigator Cavanaugh stated that the victims gave a physical description of the suspects from Co-Defendant Turner's home. After securing a search warrant, Investigator Cavanaugh went with a team of officers to execute the warrant at Co-Defendant Turner's house. Investigator Cavanaugh testified that he found several pieces of evidence corroborating the victims' story: the victims' cell phones, papers with the handwritten personal information of each victim, rope, a surveillance system, rifles, a gun cabinet with various weapons and ammunition, digital scales, and the car belonging to Mr. Beaver's mother.

Investigator Cavanaugh interviewed Mr. Dye and noted that the wound on Mr. Dye's neck was infected. Investigator Cavanaugh offered to take Mr. Dye to the hospital for treatment, but Mr. Dye refused because "[h]e just wanted to go home." On cross-examination, Investigator Cavanaugh agreed that, when a person uses methamphetamine, he can "act crazy" and with "threatening behavior[.]"

Upon defense counsel's motion, the trial court dismissed the charges in Counts Ten[2] and Eleven. After a *Momon* colloquy, Defendant chose to testify.

---

[2] Defendant moved to dismiss all counts. The trial court stated orally that it would only grant the defense's motion to dismiss in regards to Count Eleven, but the judgment forms indicate both Counts Ten and Eleven were dismissed. The trial court did not give jury instructions for Count Ten, and it did not submit Count Ten to the jury. Thus, while the record is silent regarding the trial court's dismissal of Count Ten, we conclude that Count Ten was, at some point, dismissed by the trial court or that the State entered a *nolle prosequi*.

Defendant stated that he currently worked two jobs and had been working since he made bond in the present case. He said that he was twenty-five years old at the time of trial. Defendant testified that he met Co-Defendant Turner approximately six months before the August 2017 incident.

Defendant testified that he left his vehicle with Co-Defendant Turner on the morning of August 9, 2017, and then left the house in Co-Defendant Turner's truck. Defendant stated that he went to his girlfriend's house and then to a motel where he stayed all night. Defendant explained that he saw Co-Defendant Turner again the following morning when he came to pick up Defendant. Co-Defendant Turner took Defendant back to Defendant's girlfriend's house and then Defendant drove Co-Defendant Turner's truck back to Co-Defendant Turner's house. Defendant said that, once he arrived at Co-Defendant Turner's house on August 10, 2017, he only remained for a matter of minutes before he drove his own vehicle back to his girlfriend's house, where he remained "pretty much all night." Defendant stated that Co-Defendant Turner was not "acting crazy" or unusual in any way and that Co-Defendant Turner did not say anything to Defendant about missing methamphetamine. Defendant said that, in the few minutes he was at the house on August 10, he only saw Co-Defendants Turner and Pegg.

Defendant then testified that, when he was present at Co-Defendant Turner's house on the evening August 9, 2017, Ms. Vanatta arrived to buy methamphetamine. Defendant remained outside in his vehicle. Defendant stated that, when Ms. Vanatta returned to her car, Co-Defendant Turner walked up to the car and told the victims to go into the house. Shortly after the victims went inside, Co-Defendant Turner asked Defendant to come in as well. Co-Defendant Turner was "running around . . . bouncing all over the place." Defendant stated that Co-Defendant Turner "always [had] a gun on him" but that Defendant did not have a weapon. Defendant said that Co-Defendant Turner was "getting a little hostile" but that Defendant left after about fifteen to thirty minutes and did not return until the next day, August 10.

Defendant testified that, when he returned on August 10, "everything was pretty chaotic." He said, "That's when I found out what was going on and [Co-Defendant Turner] was missing . . . his dope, but I found out by the other ones there." Defendant stated that Co-Defendant Turner cut pieces of rope and told the victims to tie themselves to Co-Defendant Turner's truck. Co-Defendant Turner

> was saying, "I'm going to take them around the yard," and the only way I could stop him was tell him "let me do it," . . . and I never started the truck. [Co-Defendant Turner] walked off. I walked over to the chain, I unhooked the chain and left [the house] and then a short period of time passed and I come back you know. I didn't really know what to do at that point in time

- 11 -

because I was using meth, you know, and that's when I come back and they were all inside getting strip-searched.

Defendant testified that he did not participate in or watch the strip search. He said that he never carried a weapon. Defendant witnessed Co-Defendant Turner cut Mr. Dye but stated that he did not participate in the fight in any way. Defendant described Co-Defendant Turner's behavior as acting "[l]ike a lunatic." Defendant said that was when he decided to leave and that he never returned to Co-Defendant Turner's house.

On cross-examination, Defendant stated that, on the evening of August 9, 2017, he returned to Co-Defendant Turner's house "for a few minutes," trying to buy methamphetamine, at which time the four victims arrived. Afterwards, he went either to his girlfriend's house or to a motel. The following day, when Co-Defendant Turner threatened to drag the victims, Defendant unhooked the victims and left the house, but he did not call the police. Defendant stated that, when he returned and the victims were being strip-searched, he did not call police. He said that people "running around fighting and stuff . . . wasn't uncommon for [Co-Defendant Turner's] place." Defendant stated that he kept returning to the house because he was a drug addict and his vehicle was there. He testified that he did not tell Investigator Cavanaugh anything about the events at Co-Defendant Turner's house when he interviewed Defendant because Defendant was on bond for another offense at the time and because Investigator Cavanaugh was only looking for Co-Defendant Turner's location. Defendant said that he did not lie to Investigator Cavanaugh when he left out information regarding the events of August 9-11 because Investigator Cavanaugh only asked him about Co-Defendant Turner's whereabouts. Defendant stated that officers kept pulling him over claiming they thought he was Co-Defendant Turner and that a lieutenant told him, "Read between the lines if you want to make it disappear. We want [Co-Defendant Turner]."

On rebuttal, Investigator Cavanaugh testified that he and another investigator asked Defendant to come to his office to speak to him, and Defendant agreed. Investigator Cavanaugh testified that, after he read Defendant his *Miranda* rights, he

asked [Defendant] if he knew about [Co-Defendant] Turner. [Defendant] said that they were acquaintances but beyond that, he didn't know anything about him.

. . . .

And I asked him them [sic] questions basically several different times in several different ways and got the same response from him. You know, I asked him if he knew about the things that had went on out there,

- 12 -

this and that; there were some bad things that had happened out at [Co-Defendant] Turner's that previous week and he indicated he didn't know anything about any of that stuff.

Following closing arguments, the jury returned a verdict of guilty of especially aggravated kidnapping in Counts One, Two, and Three, guilty of false imprisonment in Count Four, and guilty of attempted aggravated assault in Count Twelve. The trial court sentenced Defendant as a Range I standard offender to concurrent terms of eighteen years at one hundred percent release eligibility, pursuant to Tennessee Code Annotated section 40-35-501(i), for each conviction for especially aggravated kidnapping, a concurrent sentence of eleven months and twenty-nine days for the conviction for false imprisonment, and a concurrent sentence of four years with a thirty percent release eligibility for the conviction for attempted aggravated assault, for an effective sentence of eighteen years.

This timely appeal follows.

## Analysis

Defendant claims that he "was denied his due process rights by being given a disproportionately high sentence" and that the evidence is insufficient to sustain his convictions for especially aggravated kidnapping in Counts One through Three. The State responds that the evidence was sufficient to support Defendant's convictions.

As pertinent to Defendant's convictions in Counts One through Three, especially aggravated kidnapping is "false imprisonment, as defined in [Tennessee Code Annotated section] 39-13-302[,] [a]ccomplished with a deadly weapon or by display of any article used or fashioned to lead the victim to reasonably believe it to be a deadly weapon[.]" Tenn. Code Ann. § 39-13-305(a)(1) (2018). "A person commits the offense of false imprisonment who knowingly removes or confines another unlawfully so as to interfere substantially with the other's liberty." Tenn. Code Ann. § 39-13-302(a) (2018).

*Due Process Rights Related to Defendant's Sentence*

Defendant argues that he "was denied his due process rights by the imposition of a statutory penalty beyond that which would have been imposed for the underlying crimes of [Defendant] as were alleged in the indictment." Defendant does not argue that the sentence was not within the appropriate range, that the trial court failed to properly apply the purposes and principles of our Sentencing Act, or even that the sentence was not authorized or was illegal. Rather, Defendant argues that his sentence would not have been as severe if he had only been convicted of the other indicted offenses and not three

counts of Class A felony especially aggravated kidnapping. Although this argument may be true, it is not based on the facts of this case or on reality. Defendant *was indicted* for and *convicted* of three counts of especially aggravated kidnapping. Defendant's due process argument as it relates to his alleged "disproportionately high sentence" is without merit.

*Sufficiency of the Evidence*

We will separately address the sufficiency of the evidence supporting the conviction of especially aggravated kidnapping in Count One and Count Two, because after the dismissal of Count Eleven, neither Count One nor Count Two had an accompanying felony and the two counts were submitted to the jury as stand alone offenses. Count Three did have an accompanying felony, the aggravated assault of Ms. Denson indicted as Count Twelve for which Defendant was convicted of attempted aggravated assault. In Count Three, we will determine under *State v. White*, 362 S.W.3d 559 (Tenn. 2012) whether the evidence was sufficient to prove that the confinement of Ms. Denson had criminal significance beyond that necessary to consummate the underlying offense of attempted aggravated assault and whether the evidence was sufficient to support the conviction for especially aggravated kidnapping.

Additionally, Defendant asserts that Co-Defendant Turner was the sole kidnapping actor and that Defendant bears no responsibility for the kidnapping of any of the victims.

Standard of Review

Our standard of review for a sufficiency of the evidence challenge is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original); *see also* Tenn. R. App. P. 13(e). Questions of fact, the credibility of witnesses, and weight of the evidence are resolved by the fact finder. *Bland,* 958 S.W.2d at 659. This court will not reweigh the evidence. *Id.* Our standard of review "is the same whether the conviction is based upon direct or circumstantial evidence." *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)) (internal quotation marks omitted).

A guilty verdict removes the presumption of innocence, replacing it with a presumption of guilt. *Bland*, 958 S.W.2d at 659; *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). The defendant bears the burden of proving why the evidence was insufficient to support the conviction. *Bland*, 958 S.W.2d at 659; *Tuggle*, 639 S.W.2d at 914. On appeal, the "State must be afforded the strongest legitimate view of the evidence

and all reasonable inferences that may be drawn therefrom." *State v. Vasques*, 221 S.W.3d 514, 521 (Tenn. 2007).

### Counts One and Two—Especially Aggravated Kidnapping of Mr. Dye and Mr. Beaver

Over a period of forty-eight hours, Defendant and his co-defendants held Mr. Dye and Mr. Beaver captive at gunpoint. Defendant periodically stood near Mr. Dye and Mr. Beaver with a weapon, told them to cooperate or something bad would happen, and threatened to "shoot [their] kneecaps out" should they try to escape. Mr. Dye's and Mr. Beaver's cell phones were confiscated, and they were brutalized and threatened. Additionally, Defendant threatened to "gut" Mr. Beaver when it appeared that Mr. Beaver might be trying to summon assistance. Taking the evidence in the light most favorable to the State, the evidence was more than sufficient for a rational juror to find that Defendant falsely imprisoned Mr. Dye and Mr. Beaver by knowingly confining them "unlawfully so as to interfere substantially with [their] liberty" and that Defendant "accomplished" the false imprisonment "with a deadly weapon." *See* Tenn. Code Ann. § 39-13-302(a), Tenn. Code Ann. § 39-13-305(a)(1) (2018). Defendant's own conduct, separate and apart from the conduct of Co-Defendant Turner, was sufficient for the jury to find that Defendant kidnapped Mr. Dye and Mr. Beaver.

### Count Three—Especially Aggravated Kidnapping of Ms. Denson

Defendant claims that the evidence was insufficient to support the jury's finding that Defendant's removal and confinement of Ms. Denson had criminal significance beyond that necessary to consummate the underlying offense of attempted aggravated assault.

In *State v. White,* the Tennessee Supreme Court held "that the legislature did not intend for the kidnapping statutes to apply to the removal or confinement of a victim that is essentially incidental to an accompanying felony[.]" 362 S.W.3d at 562. As such, when a defendant is charged with aggravated kidnapping and with an accompanying felony, the removal or confinement must have "criminal significance above and beyond that necessary to consummate some underlying offense."[.]" *Id.* at 577. Consequently, the trial court must instruct the jury to determine whether the removal or confinement was essentially incidental to the accompanying felony or whether it was significant enough, standing alone, to support a conviction for kidnapping. *Id.* at 578.

In this case, Defendant does not dispute that the trial court properly instructed the jury as required by *White* in regards to Count Three. Because, after receiving the appropriate instruction, the jury determined that the confinement of Ms. Denson was not

essentially incidental to the accompanying felony, this court must review Defendant's due process claim under the sufficiency of the evidence standard. *Id.* at 562.

The jury's determination that Defendant's action went beyond what was necessary to consummate the offense of attempted aggravated assault of Ms. Denson was a question of fact, which we will not disturb on appeal as long as there is sufficient evidence to sustain the convictions. *State v. Romarcus Echols*, No. W2013-01758-CCA-R3-CD, 2015 WL 151047, at *8 (Tenn. Crim. App. Jan. 12, 2015) (citing *White*, 362 S.W.3d at 579; *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997)), *no perm. app. filed*; *see also State v. Christopher Lee Williams*, No. M2016-00568-CCA-R3-CD, 2017 WL 1063480, at *5 (Tenn. Crim. App. Mar. 21, 2017), *no perm. app. filed*. The evidence at trial showed that Defendant forced Ms. Denson to tie herself with ropes, chained her to his truck, "jerked the truck in drive," and pulled the rope tight around Ms. Denson's ankles. This resulted in bruising to Ms. Denson's thigh, back, and right ankle. The victims each testified that, over the course of approximately forty-eight hours, Defendant periodically stood near them with a weapon, told the victims to cooperate or something bad would happen, and threatened to "shoot [their] kneecaps out" should they try to escape. Co-Defendant Pegg stated that Defendant was present at the house "basically the whole time." Defendant "knowingly" confined Ms. Denson "unlawfully so as to interfere substantially with [her] liberty[,]" and her confinement was "accomplished with a deadly weapon." Tenn. Code Ann. § 39-13-302(a) (2018). Defendant's confinement of Ms. Denson went far beyond what was necessary to commit the attempted aggravated assault that occurred on the second day of the ordeal. The evidence that confinement of Ms. Denson had criminal significance beyond that necessary to consummate the underlying offense of attempted aggravated assault was overwhelming.

Taking the evidence in the light most favorable to the State, the evidence of confinement, standing alone, was more than sufficient for a rational juror to find that Defendant kidnapped Ms. Denson. Defendant knowingly confined Ms. Denson "unlawfully so as to interfere substantially with [her] liberty and Defendant "accomplished" the false imprisonment "with a deadly weapon." *See* Tenn. Code Ann.§ 39-13-302(a), Tenn. Code Ann. § 39-13-305(a)(1) (2018). Defendant's own conduct, separate and apart from the conduct of Co-Defendant Turner, was sufficient for the jury to find that Defendant kidnapped Ms. Denson.

## Conclusion

For the foregoing reasons, the judgments of the trial court are affirmed.

_____
ROBERT L. HOLLOWAY, JR., JUDGE